J-S27014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| OSCAR MARTINEZ | : | |
| | : | |
| Appellant | : | No. 1735 EDA 2016 |

Appeal from the Judgment of Sentence October 26, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0008142-2010,
CP-51-CR-0008143-2010

BEFORE:  GANTMAN, P.J., OTT, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:                    **FILED MAY 24, 2017**

Appellant, Oscar Martinez, appeals *nunc pro tunc* from the judgment of

sentence entered in the Philadelphia County Court of Common Pleas,

following his bench trial convictions for two counts each of rape and

corruption of minors.[1]  We affirm.

The trial court opinion accurately set forth the relevant facts of this

case as follows:

> The Commonwealth began its case by submitting a written
> stipulation concerning police and medical records and then
> called its first witness, the complainant at [docket CP-51-
> CR-0008143, J.O.], age fourteen at the time of trial, who

_____

[1] 18 Pa.C.S.A. §§ 3121(a)(1); 6301(a)(1)(i), respectively.

_____

*Retired Senior Judge assigned to the Superior Court.

testified as follows:

[J.O.] identified [Appellant] as her grandmother's husband whom she had known longer than she could remember and with whom she had a grandfather-granddaughter relationship. She would see him often at her grandmother's house and her home in Philadelphia where she lived with her stepfather, mother and sister. Her mother worked at a store down the block from their home and her stepfather worked in security on the first floor of their building. There were often times when [Appellant] would come visit her when she was alone while her parents were at work and her sister would cook and take dinner to them when they were on their…breaks. On one such occasion, three years prior to trial when [J.O.] was eleven, [Appellant] said to her that they were going to play a game. Thinking he meant a board game, she went into her room to get one and he followed her, closed the door and said they were going to play a different type of game. He put her on the floor, took off her clothes and engaged her in intercourse. After that, her back started to hurt and she experienced a certain type of odor coming from her vagina. She told her mother about those complaints[,] who took [J.O.] to a regular doctor who conducted a urine test and said it was just a urinary tract infection. About a year or so later, after her family had moved to New Jersey[2] and [J.O.] was still experiencing the odor, [J.O.'s] mother took her and her sister, [S.O.], to a hospital in New Jersey where [J.O.] was given another urine test and an OB/GYN exam and was told she had a "STD called trich" (a Sexually Transmitted Disease, Trichomoniasis, often called "trich"), for which she was given antibiotics. [J.O.] then told the doctor, who told [J.O.'s] mother, about the incident with [Appellant].

On cross-examination, [J.O.] said she didn't tell anyone about the incident because she was scared and didn't know if anyone would believe her because she was only 11 and [Appellant] was a grown man. After cross-examination, the Commonwealth entered into evidence by stipulation

---

[2] J.O.'s family moved to New Jersey in July 2009.

the medical records [of J.O.] from "Atlantic Care," the hospital to which she referred, and then called [J.O.'s] sister, the complainant at [docket CP-51-CR-0008142, S.O.], age eighteen at [the] time of trial.

[S.O.] also identified [Appellant] as her grandmother's husband whom she had known longer than she could remember and with whom she had a grandfather-granddaughter relationship. Whenever her parents were working[,] she and her sister would take turns bringing them dinner, which would take about twenty-five to thirty minutes, and [Appellant] would come visit them about twice a week. One time, when she was about eleven or twelve and her sister took her stepfather dinner, [Appellant] told [S.O.] to go into her bedroom, walked in behind her, closed the door, told her not to say anything, took off her clothes and his pants and had intercourse with her. When asked whether this happened more than once, [S.O.] said [Appellant] would come over at least twice a week and it would happen every time, continuing from the time she was eleven, the last time when she was a freshman in high school in 2008-2009. It happened twice while she and [Appellant] were watching television in her grandmother's bedroom at her [grandmother's] and [Appellant's] house, where she and her sister also had bedrooms, always when they were alone. In May of 2010, [S.O.] went to the hospital in New Jersey with her mother and her sister due to her having back and cramping pains and told the doctor there about the incidents with [Appellant] and also informed her mother.

On cross-examination, defense counsel had [S.O.] agree that they found nothing wrong with her at the hospital,[3] and, in Family Court, [S.O.] testified that [Appellant] had intercourse with her three times a week from when she was eleven [until] when she was fifteen, which came to 627 times, but, previous to that had told the police that it only happened twelve times, which [S.O.] attributed to increasing memories over time, and to her perceived

---

[3] The hospital doctors attributed S.O.'s back and cramping pains to a pulled muscle.

differences between the exact questions that the police and the prosecutor had asked her; counsel also noted that, while [Appellant] was a much larger person than [S.O.] and [S.O.] described him as having laid right on top of her with his arms on the floor, he did not crush her. After re-direct and re-cross, the prosecutor entered the following into evidence by stipulation:

Cindy Delgado would testify [t]hat she's a pediatrician who works at a Child Abuse Research Education and Service Institute, also known as CARES…. That on June 24th of 2010, she examined [S.O.] for a diagnosis and treatment of any residual findings of sexual abuse[.]

[T]hat [S.O.] arrived at CARES with her mother, father and sister, [J.O.]

Prior to the examination, Dr. Delgado spoke with [S.O.] [S.O.] told the doctor that she never had consensual sex and does not have a boyfriend. She also never had vaginal discharge, odor or bleeding or a history of accidental genital trauma. [S.O.] further stated that she was almost 12 years old when [Appellant] began abusing her. [S.O.] said that she thought it was not right when he started touching her[.] [S.O.] said [Appellant] touched her at her grandmother's house and that he took off [her] clothes, laid [her] on the ground, climbed on top of [her], spread [her] legs and put his penis in [her] vagina. When he was finished, [S.O.] went into the bathroom and peed, it hurt and blood was in the toilet. [Appellant], she said, told her she could not tell anybody because nobody would believe her. [S.O.] told Dr. Delgado that it happened a couple of times between the ages of 11 and 15. [S.O.] also said that two years ago it happened at her stepfather's [home].

The examination revealed that [S.O.] has an absence of hymenal tissue at the six o'clock position indicating a well-healed transection. In light of no history of describing accidental blunt genital trauma, the only explanation for this transection is the forced

sexual intercourse [S.O.] described.

The prosecutor then called [Victims'] mother, [C.S.], who confirmed everything in which her daughters described her being involved, including the visit to the hospital in Atlantic City [in May 2010] where a doctor there told her that [J.O.] had an infection that was transmitted by sex, for which they treated her and, after some follow-up care, was completely cleared up. On cross-examination, [defense] counsel took great pains pointing out that, at the hospital, she was given discharge instructions which said to call in three days for lab results but she had said that she and her daughters received the test results that same day. [C.S.] replied that she did not recall those instructions, reiterated her recollection of getting the results at the hospital, and pointed out that they (probably meaning only [J.O.]) also were prescribed their antibiotics that same day. The prosecutor moved the state's exhibits into evidence, C-1 being the Atlantic City hospital records for [J.O.], C-2 the [Dr.] Delgado stipulation and C-3[,] a medical report that went with the latter, and rested.

The defense called [M.S.P.], who characterized herself as [Appellant's] lover, was sexually active with him from 2006 up until 2009, would frequently get tested for STDs, including trich, the last time having been June 30, 2010, and never tested positive. Defense counsel submitted by stipulation[:] "That there were three character witnesses…[who would testify] that [Appellant] is a person of good character of peacefulness, honesty, law-abiding." … The defense then moved into evidence D-2, the hospital records which the prosecutor had moved in as C-1, but which included the discharge instructions about which he had questioned [Victims'] mother containing the recommendation of a follow-up call that were not included with the latter, to which there was no objection, and D-3, which counsel characterized as [several learned treatises on trich and the follow-up tests associated with diagnosis of trich, which the court admitted over the Commonwealth's objection].

The defense then rested, and, after announcing its verdict, the court explained[:]

> The existence or nonexistence of the sexually transmitted disease is not a dispositive factor in this case. The primary factor as in all sexual assault cases has to do with the [c]ourt's analysis of credibility of the Commonwealth witnesses which [the court] found not to be wanting. The verdict would have been the same even if there [were] no scientific evidence.

(Trial Court Opinion, filed July 29, 2016, at 2-6) (internal citations omitted). Following trial, the court convicted Appellant of two counts each of rape and corruption of minors.

On October 26, 2012, the court sentenced Appellant at each docket to concurrent terms of ten to twenty years' imprisonment for rape, plus a consecutive term of two and one-half to five years' imprisonment for corruption of minors. Appellant subsequently filed post-sentence motions, which were denied by operation of law, but he did not file a direct appeal.

On July 22, 2013, Appellant timely filed a *pro se* PCRA petition. The court appointed counsel, who filed an amended PCRA petition on June 27, 2014, requesting reinstatement of Appellant's post-sentence and direct appeal rights *nunc pro tunc*. Appellant filed a second amended PCRA petition on February 22, 2016, withdrawing his request to file post-sentence motions *nunc pro tunc*. On May 2, 2016, the PCRA court reinstated Appellant's direct appeal rights *nunc pro tunc*. Appellant timely filed a *nunc pro tunc* notice of appeal on June 1, 2016. On June 21, 2016, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely complied on July 12,

2016.

Appellant raises the following issue for our review:

WAS THE EVIDENCE AT TRIAL INSUFFICIENT TO SUSTAIN THE CONVICTIONS AS THEY WERE SO VAGUE AS TO WHEN THE ALLEGED INCIDENTS OCCURRED AND PREVENTED APPELLANT FROM MOUNTING A DEFENSE?

(Appellant's Brief at 7).

Appellant argues Victims failed to provide specific dates and times regarding when the alleged assault(s) took place. Appellant asserts Victims isolated their allegations to occurring "around" a specific year. Appellant maintains S.O. initially told police Appellant assaulted her on twelve occasions. Appellant claims S.O. later stated Appellant abused her three times each week for four years, which totals over 600 assaults. Appellant contends Victims' lack of precise dates for the alleged assault(s) and varying testimony deprived him of an opportunity to defend adequately against their allegations, particularly precluding Appellant from supplying an alibi defense. Appellant concludes the evidence was insufficient to sustain the verdicts, and this Court must reverse his convictions. We disagree.

When examining a challenge to the sufficiency of evidence:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every

possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011), *appeal denied*, 613 Pa. 642, 32 A.3d 1275 (2011) (quoting *Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa.Super. 2005)).

The Crimes Code defines the offenses of rape and corruption of minors, in relevant part, as follows:

**§ 3121. Rape**

**(a) Offense defined.**—A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant:

(1) By forcible compulsion.

18 Pa.C.S.A. § 3121(a)(1).

**§ 6301. Corruption of minors**

**(a) Offense defined.**—

(1)(i) Except as provided in subparagraph (ii), whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor

- 8 -

in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

18 Pa.C.S.A. § 6301(a)(1)(i).

As a general rule, the Commonwealth must fix with reasonable certainty the date when an alleged offense occurred. *Commonwealth v. Devlin*, 460 Pa. 508, 333 A.2d 888 (1975). Nevertheless, there is no "exact degree of specificity in the proof of the date of a crime which will be required or the amount of latitude which will be acceptable." *Id.* at 517, 333 A.2d at 892. "Certainly the Commonwealth need not always prove a single specific date of the crime. Any leeway permissible would vary with the nature of the crime and the age and condition of the victim, balanced against the rights of the accused." *Id.* (internal citation and footnote omitted). "A *Devlin* claim is a form of motion in arrest of judgment…; if the claim is meritorious, the proper remedy is to vacate judgment of sentence and discharge the defendant." *Commonwealth v. Groff*, 548 A.2d 1237, 1240-41 (Pa.Super. 1988). "[F]or purposes of a *Devlin* claim, the Commonwealth must be allowed a reasonable measure of flexibility when faced with the special difficulties involved in ascertaining the date of an assault upon a young child." *Id.* at 1241 (holding Commonwealth established date of defendant's offenses with sufficient particularity where child victim testified she was molested while living with defendant and was wearing bathing suit when he lured her into his bedroom; Commonwealth presented testimony from victim's grandmother and stepmother which helped to narrow timeframe of

abuse to summer of 1985, based on victim's behavior during that time; in light of nature of crime and age and condition of victim, Commonwealth's proof as to time of criminal acts was constitutionally adequate).

In cases involving a continuous course of conduct, the Commonwealth must be afforded even broader latitude in establishing the dates of the assaults. *Id.  See also Commonwealth v. Brooks*, 7 A.3d 852 (Pa.Super. 2010), *appeal denied*, 610 Pa. 614, 21 A.3d 1189 (2011) (explaining Commonwealth must be afforded broad latitude when attempting to fix date of offenses which involve continuous course of criminal conduct, particularly in cases involving sexual offenses against child victim; evidence was sufficient to sustain defendant's sex-offense convictions where one victim testified that defendant forced him to perform oral and anal sex every day, and another victim testified that defendant forced her to perform oral sex more than ten times and pinpointed some assaults to when it was warm outside and she was wearing shorts); *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984 (Pa.Super. 2007), *appeal denied*, 596 Pa. 715, 944 A.2d 756 (2008) (holding evidence was sufficient to sustain defendant's convictions for indecent assault, endangering welfare of children, and corruption of minors, in connection with defendant's ongoing sex abuse of his six-year-old son; victim identified three different occasions on which he was abused between September 1997 and March 1998; victim said he remembered when abuse began because it was contemporaneous with his start of

kindergarten, and said abuse ended when defendant was arrested; victim's testimony satisfied due process concerns under **Devlin**; six-year-old child cannot be expected to remember each and every date he was victimized, especially where those events are numerous and occur over extended period of time; to require young children to provide such detail would give child predators free rein); **Commonwealth v. Robinson**, 462 A.2d 840 (Pa.Super. 1983) (holding evidence was sufficient to support defendant's convictions for statutory rape and corruption of minors where victim testified that sexual acts had occurred on weekly basis from January 1978 until September 1980; victim made entries in diary on numerous dates during 1978 and 1979, and had noted in diary three instances of defendant's "treatments" of her; victim testified defendant's "treatments" occurred about three times each week between 1978-1980; victim's testimony was sufficient to establish with **reasonable** certainty dates of assaults); **Commonwealth v. Niemetz**, 422 A.2d 1369 (Pa.Super. 1980) (holding evidence was sufficient to support defendant's convictions for rape, corruption of minors, and related offenses involving abuse of defendant's minor step-daughter; notwithstanding victim's inability to pinpoint specific dates, victim testified about defendant's repeated assaults throughout her childhood beginning when she was nine years old until she was about seventeen; distinguishing **Devlin**, which involved one incident of assault, with cases involving numerous assaults over time; cases involving one

incident of sexual assault are more susceptible to fixing date of offense with "reasonable certainty" than those cases involving numerous abuses over time).

Instantly, J.O. testified at trial, *inter alia*, that she has known Appellant for as long as she can remember and shared a granddaughter-grandfather relationship with Appellant. Appellant often came to her house while her parents were at work. J.O.'s parents worked close to her house, so J.O. and S.O. would take turns bringing their parents dinner during their respective breaks. On one occasion, when J.O. was eleven years old,[4] Appellant was at her house while S.O. was delivering dinner to their parents. Appellant told J.O. they were going to play a game. J.O. went into her room expecting to play a board game. Appellant then told J.O. that they were going to play a different type of game. Appellant closed J.O.'s bedroom door, took off J.O.'s clothes, made her lay on the floor, and had sexual intercourse with her. Following the assault, J.O. said her back started to hurt and she experienced an odor coming from her vagina. J.O. told her mother about her ailments and J.O.'s mother took J.O. to a doctor, who diagnosed J.O. with a urinary tract infection. About a year later, after J.O.'s family had moved to New Jersey, J.O. still had the vaginal odor, so her mother took her to the hospital where a urine screen and gynecological exam were performed. J.O.'s test

---

[4] J.O. was born in April 1998, so the incident occurred around 2009.

results confirmed she had a sexually transmitted disease called Trichomoniasis, for which she was given antibiotics. At that point, J.O. disclosed Appellant's abuse to the doctor, who informed J.O.'s mother about the abuse. (*See* N.T. Trial, 5/11/12, 14-35.)

S.O. testified at trial, *inter alia*, that she has also known Appellant for as long as she can remember and that she enjoyed a granddaughter-grandfather relationship with him. S.O. echoed J.O.'s testimony that they often took turns preparing and delivering dinner to their parents during their employment breaks. S.O. said Appellant visited her home about twice each week. One time when S.O. was about eleven or twelve years old,[5] Appellant told her to go into her bedroom, walked in behind her, closed the door, took off S.O.'s clothes, and had sexual intercourse with her. S.O. testified the abuse continued every time Appellant visited their home until she was a freshman in high school in 2008-2009. S.O. also said the abuse occurred twice at Appellant and her grandmother's home. S.O. described those assaults taking place while S.O. and Appellant were watching television in Appellant and her grandmother's bedroom. S.O. stated that on the date her mother took J.O. to the hospital in New Jersey for treatment, S.O. was also having back pain and cramps. After J.O. disclosed Appellant's abuse, S.O. informed the doctor and her mother that Appellant had abused her as well.

---

[5] S.O. was born in April 1994, so the first incident of abuse occurred around 2005 or 2006.

(*See id.* at 36-76.)

Victims' mother also testified at trial and corroborated her daughters' accounts of bringing her and her husband dinner almost every night that they worked. Victims' mother said Appellant would often be alone with her daughters, especially when she and her husband were working. Victims' mother recalled J.O. complaining about pain when she urinated and a vaginal odor. Victims' mother described taking J.O. to a doctor, who diagnosed J.O. with a urinary tract infection. After her family moved to New Jersey, J.O. was still complaining about the vaginal odor, so, around May 2010, Victims' mother brought J.O. and S.O. to the hospital. The doctor performed some tests and diagnosed J.O. with a sexually transmitted disease. During that hospital visit, J.O. and S.O. disclosed Appellant's abuse. (*Id.* at 80-95.)

The Commonwealth also presented, by way of stipulation, evidence of J.O. and S.O.'s medical records, which corroborated their accounts of seeking medical treatment; and testimony from Dr. Cindy Delgado, describing her examination of S.O. on June 24, 2010, and corroborating S.O.'s description of the forced sexual intercourse. (*Id.* at 3-4; 76-78.)

Under these circumstances, the evidence was sufficient to support Appellant's convictions. J.O. testified that the abuse occurred in her Philadelphia home when she was eleven years old, which would have been sometime between April and July 2009, before her family moved to New

Jersey. J.O.'s medical records and testimony from J.O.'s mother confirmed J.O. sought treatment after the move. S.O. testified that Appellant began abusing her when she was eleven or twelve years old (around 2005 or 2006) and that the abuse continued until she was a freshman in high school in 2008-2009. S.O. said the abuse occurred each time Appellant visited their home throughout those years, which was about two nights per week. S.O. cannot be expected to recall the dates of each of those regular and frequent assaults.[6] *See G.D.M., Sr., supra*. Therefore, the Commonwealth established with **reasonable** certainty the dates of the assaults to sustain Appellant's convictions for rape and corruption of minors.[7] *See id.  See also Brooks, supra*; *Groff, supra*; *Robinson, supra*; *Niemetz, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

---

[6] The trial court, as fact-finder, was free to resolve any inconsistencies in S.O.'s testimony regarding the number of assaults. *See generally Commonwealth v. Horne*, 89 A.3d 277 (Pa.Super. 2014), *appeal denied*, 628 Pa. 620, 102 A.3d 984 (2014) (explaining it is function of fact-finder to resolve any inconsistencies in testimony and to evaluate credibility of witnesses).

[7] The Commonwealth has filed a motion to seal the record because the trial court refers to Victims by name. This appellate Court's redaction policies, in addition to the statutes the Commonwealth cites in its motion, provide a framework for protecting the privacy of victims in sexual assault cases. Therefore, we deny the Commonwealth's motion to seal. Nevertheless, we strongly encourage trial courts to substitute initials for the names of sexual assault victims as an added layer of privacy protection.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/24/2017